## A99A1016. IN RE HEALY.

(526 SE2d 616)

POPE, Presiding Judge.

Attorney Timothy P. Healy was convicted of direct criminal contempt and appeals. In his sole enumeration Healy claims that the court erred in finding that Healy had committed a contemptible act. We conclude that Healy's behavior did not constitute criminal contempt and reverse.

This case arose during Healy's representation of Clint Shurtleff on a murder case in which the child victim had died as a result of a blunt trauma to his head. The first trial of the case resulted in a hung jury. During the second trial, the State called as an expert witness the Crime Lab's chief medical examiner, James Dawson, who had performed the autopsy on the victim. Dawson testified that he could not determine if the child's death was accidental or if the child had been a homicide victim. Dawson also testified that he consulted

Kris Sperry, who replaced Dawson at the Crime Lab, about the cause of the death of the child.

Next, Healy cross-examined Dawson. Healy asked Dawson if he had previously testified in this case, and Dawson stated that he had. In response to Healy's question, Dawson then acknowledged that Sperry did not testify in the earlier trial. During this exchange Healy asked Dawson: "And the last time you testified in this case without Dr. Sperry being around to help in this search for the truth my client was not convicted, was he?"

The prosecutor objected to this question, and the judge called the attorneys to the bench. The judge then excused the jury from the courtroom, and the prosecutor stated he believed that Healy's question was calculated to lead to a mistrial. Healy explained that the question went to Sperry's credibility as a witness who was brought into the case only after the State was unable to convict Shurtleff in the first trial. Healy said that he thought the State was creating an erroneous impression with the jury regarding Sperry's involvement and that he was trying to correct the misimpression.

The court then asked Healy for authority in support of allowing the jury to know the result of the first trial. When Healy was unable to provide a citation, the court stated that it would have a ten-minute recess during which Healy was to go to the law library and find a citation to support his position.

After the recess, Healy was unable to cite any direct authority for his position. The prosecutor argued that though the State was willing to stipulate that the case had been tried before, Healy should not have told the jury that the previous verdict was "not guilty." Next, the court allowed Healy to speak on his own behalf. After Healy argued, the court found Healy in contempt and stated that the sentence would be determined at the conclusion of the case, after a hearing. The jury then returned to the courtroom, and the court instructed the jury to disregard the objectionable question.

Several weeks later, the court entered an order which held Healy in direct criminal contempt and sentenced him. In its order, the court noted that Healy's question, "elicited testimony that his client was not found guilty at said previous trial." The court found that this conduct interrupted and interfered with its ability to administer justice; the court also found that Healy's conduct was intentional.

In his sole enumeration, Healy argues that the court erred in finding him in contempt because his conduct was not inappropriate and did not imperil the administration of justice. We first note that, contrary to the representations otherwise, the record shows that Healy referred in his question to the fact that his client had not "been convicted" in the previous trial. Healy did not state that his client had been found "not guilty" in the previous trial, as the State con-

tends, nor did his question elicit testimony to that effect, as the trial court stated in its order. Healy argues that the question he asked of Dawson was not improper and that, accordingly, the evidence regarding the contempt was insufficient. As stated above, we conclude that Healy's allegedly offensive question, standing alone, did not justify the finding of contempt.

> The appropriate standard of appellate review for a criminal contempt conviction is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

(Citations and punctuation omitted; emphasis in original.) *In re Bryant*, 188 Ga. App. 383, 384 (2) (373 SE2d 74) (1988).

With respect to the substance of criminal contempt: "[c]riminal contempt is that which involves some disrespectful or contumacious conduct toward the court." (Citations and punctuation omitted.) *In re Henritze*, 181 Ga. App. 560, 562 (353 SE2d 58) (1987). OCGA § 15-1-3 (1) provides that every court has the power "[t]o preserve and enforce order in its immediate presence and, as near thereto as is necessary, to prevent interruption, disturbance, or hindrance to its proceedings."

> The power to summarily adjudicate and punish for direct criminal contempt is derived from the court's authority to maintain courtroom order and decorum. "During trial, a trial judge has the power, when necessary to maintain order in the courtroom, to declare conduct committed in his presence and observed by him to be contemptuous, and, after affording the contemnor an opportunity to speak in his or her own behalf, to announce punishment summarily and without further notice or hearing." *Dowdy v. Palmour*, 251 Ga. 135, 141-142 [(2) (b)] (304 SE2d 52) (1983).

*In re Shafer*, 216 Ga. App. 725 (455 SE2d 421) (1995).

The court set forth more particulars regarding the evidence necessary to sustain a contempt conviction in *In re Shafer*, stating:

> [i]n a summary contempt proceeding, objectively observable and describable behavior that causes an articulable interference with the administration of justice must be demonstrably present. Both the bad conduct and its adverse impact must be set forth with specificity in the ruling by the court that finds as a matter of fact that no justification exists for the alleged contemnor's behavior. If these procedural steps

are taken verbally, as is usually the case with a court trying to restore some immediate order in its proceedings, the judge must *as soon as possible* create a written record that preserves the following: (1) the notice to the perpetrator of the offensive conduct subject to being viewed as contemptuous due to its actual or imminent adverse impact; (2) a detailed description of the bad acts committed or omitted by the perpetrator despite a contemporaneous warning by the court to refrain; (3) an explanation of the deleterious impact on the court's operations or its integrity; (4) a recitation of the perpetrator's reasons given as justification for the questionable conduct; (5) a finding of fact by the judge of direct conduct interfering with the court's administration of justice, or imminently threatening such consequences; and (6) an order declaring the respondent in contempt of court and imposing a statutorily authorized sanction.

(Emphasis in original.) 216 Ga. App. at 726 (1).

Although, unlike in this case, in *In re Shafer* there was no transcript of the behavior which constituted the alleged contempt, the guidelines the court set forth in that case illuminate our inquiry here. And the problem with Healy's allegedly contemptuous behavior is evident: Healy's question, in and of itself, was not sufficiently offensive to warrant the finding of contempt. While we do not condone Healy's interjection of the first trial into the second, the act of asking this question — standing alone — is not sufficient evidence to sustain the contempt conviction.[1]

In asking the objectionable question, Healy did not usurp the court's authority or interfere with the administration of justice. There is no indication from the record that the parties were instructed before Healy's question to refrain from mentioning the first trial, nor is there any indication that Healy repeated the offensive behavior. In other words, Healy did not *defy* any instruction from the court in asking the question; he was simply defending his client by trying to impeach Dawson.

We also note that given the facts of this case, no harm resulted from Healy's question. In fact, after the question, the State stipulated that Healy could mention the first trial — the State simply wanted to bar him from stating the results of that trial. But, even

---

[1] Nevertheless, we agree that better practice dictates that the parties refrain from mentioning the previous trial. Although the dissent contends that the principle that a new trial is required when the jury is told of a prior trial result is firmly established, it is difficult to find criminal cases which clearly and directly state that proposition. The seeming dearth of cases on this point further supports our conclusion that Healy's question did not warrant an automatic finding of contempt.

without the stipulation, the jury had heard that there had been a previous trial; for example, earlier in Healy's cross-examination of Dawson, Healy asked without objection whether Dawson had "testified before in this case." Clearly, the jury could figure out that Shurtleff had not been convicted, simply by virtue of the fact that he was being tried again.

Although it is conceivable that a criminal conviction for contempt could be supported by one improper question, here the question Healy asked does not constitute a sufficient predicate for contempt, and the finding must be reversed. While the dissent correctly notes that a trial court does not operate in a vacuum, this court cannot create facts to support a finding of contempt when those facts are not clear from the record. There is nothing in the portions of the record from which the dissent quotes to indicate that Healy was doing anything other than zealously representing his client. And, though the dissent warns against making trial judges anxious about the exercise of their authority, we should also be cautious about making counsel unduly anxious about their zealous representation of clients. While it is not always necessary that a trial court instruct or warn counsel before finding him in contempt, in this case the trial court should have warned Healy before making its finding.

*Judgment reversed. Johnson, C. J., Smith and Barnes, JJ., concur. Blackburn, P. J., Eldridge and Ellington, JJ., dissent.*

ELDRIDGE, Judge, dissenting.

I cannot agree with my colleagues' reversal of this case. First, I find the legal reasoning employed in order to support reversal to be dangerously flawed. Second, the evidence was sufficient to support the trial court's order finding Healy in contempt of court.

1. (a) If the majority acknowledges that Healy's knowing and intentional comment on the results of his client's prior trial was improper and grounds for mistrial, then such would be an interference with the "administration of justice," and this case would have to be affirmed. See OCGA § 15-1-4 (a) (1). Accordingly, the majority must fashion a new rule to support reversal.[2] To that end, the majority finds that Healy's comment — standing alone — is not improper and thus "not sufficient to sustain contempt," but concludes that "better practice dictates that the parties refrain from *mentioning* the previous trial." (Emphasis supplied.)

To me, the majority does disservice to the bench and bar when it mischaracterizes Healy's error as simply "mentioning the previous trial." It is not the mentioning of the prior trial, but the *result* of the

---

[2] With respect, in my view, this is how "bad law" happens.

prior trial that comprised the improper conduct — which fact was recognized by the trial court *and* Healy.

> It is a well established principle pronounced 110 years ago . . . that where a jury is apprized of a former verdict and such information might militate against the interest of a party to the case on trial, it is ground upon which a new trial may be granted the injured party.

(Citation omitted.) *Hardwick v. Ga. Power Co.*, 100 Ga. App. 38, 46-47 (6) (110 SE2d 24) (1959).[3]

The purpose is to prevent a jury from being influenced by the decision of a prior jury on the same issues. *Hardwick v. Ga. Power Co.*, supra; *Waters v. State*, 25 Ga. App. 577, 579 (103 SE 835) (1920).

Moreover, until this case, the State's mentioning of the result of a previous trial would be improper and would warrant a mistrial — without right of appeal. To truly appreciate the magnitude of the majority's new rule of law where it is *not* improper to "mention the prior trial" — including the results thereof — imagine the prosecutor asking Healy's question, duly paraphrased, on retrial of a criminal conviction after appellate reversal, "And the last time you testified in this case . . . to help in this search for the truth, defendant was convicted, wasn't he?" Now, from the date of this majority opinion, the above statement — standing alone — is *not* improper when asked by the State or the defense, although the "better practice dictates that the parties refrain from mentioning the previous trial." Under the majority's analysis, this statement now provides no grounds for mistrial, and the intentional making of this statement provides no grounds to hold a prosecutor or a defense attorney in contempt.[4]

I believe, however, "the better practice" would be for this Court to adhere to long-standing principles of law when it comes to apprising the jury of the *result* of a prior proceeding. Under the law (as it stood before the majority's holding), if either party mentions the results of a defendant's prior trial, such comment is improper and warrants mistrial. As a consequence, the trial court's finding that Healy both knew the comment was improper and intentionally made

---

[3] *Killen v. Sistrunk*, 7 Ga. 281 (1849); *Waters v. State*, 25 Ga. App. 577, 579 (103 SE 835) (1920); *Morris v. State*, 49 Ga. App. 138 (174 SE 385) (1934); *Brown v. State*, 110 Ga. App. 401, 405 (138 SE2d 741) (1964); *Allmond v. Johnson*, 153 Ga. App. 59, 61 (264 SE2d 544) (1980); see also *Kornegay v. State*, 174 Ga. App. 279, 286 (329 SE2d 601) (1985) (Benham, J., concurring specially).

[4] Certainly there is no legal basis for the creation of a double standard for the defense and the State in this area: " 'The Constitution guarantees to every defendant a fair and impartial trial. *Every litigant* is entitled to the same right, and he does not get it where any influence except the law and the evidence [are] allowed to affect the minds of the jury.' " (Emphasis supplied.) *Kornegay v. State*, supra at 286.

it provides a sufficient basis for mistrial and thus for contempt as an interference with the "administration of justice." OCGA § 15-1-4 (a) (1).

(b) In addition, to support reversal, the majority uses the following flawed analyses which have the potential for long-range damage:

(i) There is no requirement in the statute that a trial court "warn" counsel or wait for counsel to *"defy"* an order of the court before the trial court may exercise control of misbehavior in the courtroom through contempt powers. OCGA § 15-1-4 (a) (1). The cases upon which the majority relies deal with OCGA § 15-1-4 (a) (3) relating to disobedience of the court's orders or directives. Here, we deal with OCGA § 15-1-4 (a) (1), intentional misbehavior in the presence of the court, in asking a question that could mistry the case; as such, Healy's conduct interfered with the administration of justice and was subject to contempt.

For the majority to meld the two subsections together and graft onto OCGA § 15-1-4 (a) (1) a requirement that a trial court cannot correct intentional misbehavior which could result in mistrial unless it is in defiance of an order or warning is to endorse chaos in the courtroom — a chaos that this Court does not have to live with. This implicit holding in the majority opinion does immense damage to the judiciary, violates the statute, and should be a cause of deep concern.

(ii) The majority's "harmless error" analysis is inappropriate in reviewing a contempt conviction. Such analysis is a hindsight evaluation of the *effects* of Healy's deliberately improper comment but does not address the trial court's statutory right to punish Healy for such intentional, impermissible conduct under OCGA § 15-1-4 (a) (1).

(iii) The fact that Healy's intentional comment on the results of the prior trial used the term "not convicted" instead of "not guilty" in no way makes the comment proper. The prohibited result was the same. Healy deliberately apprised the instant jury that another jury — "searching for the truth" — did not convict his client in a previous trial. The purpose was to influence the current jury's consideration of Sperry's testimony, as Healy *conceded* at trial.[5]

The record shows that this is a straightforward case of contempt based on an improper, mistrial-worthy comment that Healy knowingly and intentionally made in violation of long-standing evidentiary principles, simply because Healy made the personal decision

---

[5] This Court should not endorse a process where creativity in informing a jury of the results of the prior trial is rewarded. The rule is no less violated when, for example, the State informs the jury, "And the last time you testified in this case . . . to help in this search for the truth, defendant left in handcuffs, didn't he?" Or the defense informs the jury, "And the last time you testified in this case . . . to help in this search for the truth, defendant went free, didn't he?" The prohibited result is the same, even without the majority's talismanic "guilty" or "not guilty."

that it was necessary in order to give his client a "fair" trial.

> The broad authority of a judge to preserve good order in the courtroom by the use of contempt power is well recognized and must be preserved if the courts are to perform their public duty. Therefore in-court statements and conduct are subject to reasonable control.

*Garland v. State*, 253 Ga. 789, 791 (325 SE2d 131) (1985).

In my view, this Court should hesitate to second-guess a trial court's use of judicial authority to maintain order during the course of a jury trial. Each time we reverse a trial court's legitimate exercise of contempt powers, we chip away at the foundation upon which our legal structure is built, make trial judges more anxious about the exercise of their rightful authority, and thereby place more of that authority into the hands of advocates: a ruinous result. Trial experience and the facts of this case demonstrate that the flame of "zealous representation" which so concerns the majority burns bright enough without this Court pumping the bellows through unauthorized reversal.

2. There is more than sufficient evidence of record to support the trial court's order finding Healy in contempt of court.

Healy was able to get a hung jury on his client's first murder trial in a large part because pathologist James Dawson could testify only that the cause of the victim's death was "undetermined." Then Kris Sperry, Georgia's Chief Medical Examiner, was called in at Dawson's suggestion for the second trial. Using his expertise as a forensic pathologist, Sperry was able to conclude that the victim's death was a homicide which could not have occurred in the manner presented by the defense in the first trial. Sperry testified, repeatedly, to that effect in the second trial. The record shows that Healy was clearly upset about this result and grew increasingly frustrated with Dr. Sperry's testimony. It was into this climate that the State called Dr. Dawson to the stand. Healy immediately made the following objection to Dawson's testimony, "I'm going to object to anything he went into with [Kris Sperry]. That's hearsay. It's an out-of-court statement, and my client wasn't able to participate in this rank hearsay, and I'm objecting to it." On the State's direct, Dr. Dawson testified that if he had had the information he now possessed, he would not have made the same "undetermined" death diagnosis. Then, Healy cross-examined Dr. Dawson:

> [Healy:] And you've testified in murder cases before without Dr. Sperry's help, haven't you. . . . And in fact, you have testified before in this case, haven't you? . . . And Dr. Sperry

wasn't with you, was he? . . . Mr. McCollum here was using you as his expert in — in connection with that proceeding, wasn't he. . . . Alright. And Sperry was nowhere to be found, .was he? . . . And the prosecuting attorney depended on your expertise and your opinion in — in that particular proceeding, didn't he? . . . Alright. And the last time you testified in this case without Dr. Sperry being around to help in this search for the truth my client was not convicted, was he?

The State objected. The jury was removed. The trial court permitted Healy to explain his conduct:

[Healy:] The District Attorney in this case has created an utterly false impression to this Jury. . . . This District Attorney tried this case in February with this expert without Dr. Sperry, and the result was a hung jury. There was no Dr. Sperry around. There was no reliance on Dr. Sperry. . . . And now throughout Dr. Dawson's testimony Mr. McCollum has intentionally and purposefully created a false impression to this Jury. He now wants the Jury to ignore the expertise of this — this witness. He has in effect he has impeached his own witness by the way he's presented this case. And I believe that the only legitimate way and the fairest way to bring that to the Jury's attention is to show that Sperry wasn't around when Mr. McCollum prosecuted this case the first time, that only this witness was. And Jay [(the assistant district attorney)] put all his basket — all his eggs in this one basket in February. And it's just not fair to the Defense to create that kind of impression to this Jury, that Sperry's right and he's wrong.
[Trial court:] And what — under what theory of law are you entitled to bring in before this Jury the result of that first trial?
[Healy:] Fairness and justice, Judge.
[Trial court:] I'm going to give you ten minutes to go to that law library and get me a citation of authority that will change my mind from declaring mistrial and finding Counsel in contempt.

Thereafter, Healy failed to find legal support for his position that "fairness and justice" permitted him to improperly comment on the results of his client's prior trial. The trial court acceded to the State's desire to keep the jury, gave Healy opportunity to make further response, held Healy in contempt for his deliberately improper com-

ment, delayed punishment, and gave curative instructions to the jury.

Here, the evidence of record shows Healy admitted that he intentionally asked the improper question because he felt it was only "fair" to the defense. Moreover, the trial court noted that Healy is an experienced attorney. Healy *knew* the comment was improper, but he personally felt that justice required the asking. It was not Healy's call to make. By knowingly and intentionally making the improper comment on the results of his client's prior trial, Healy deliberately usurped the trial court's authority to rule on the admissibility of evidence and deliberately interfered with the "administration of justice." OCGA § 15-1-4 (a) (1). The trial court had the authority to so find. Id. *Viewing the evidence in a light to uphold the trial court's order* — as this Court must do in this case — *any* rational trier of fact could have found Healy's conduct contumacious. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *In re Irvin*, 254 Ga. 251 (328 SE2d 215) (1985).

The judgment below should be affirmed.

I am authorized to state that Presiding Judge Blackburn and Judge Ellington join in this dissent.

DECIDED DECEMBER 3, 1999.

*Sean A. Black*, for appellant.
*Michael H. Crawford, District Attorney*, for appellee.