S10M0390. THE STATE v. MURRAY.

(687 SE2d 790)

THOMPSON, Justice.

The State sought and this Court granted an emergency supersedeas with regard to a contempt order issued against an assistant district attorney in the underlying murder prosecution. In light of the dissenting opinion, which posits that this Court does not have jurisdiction because the finding of contempt bears no relation to the murder case, we are compelled to re-examine our longstanding order declaring that all murder cases, and all interlocutory appeals in murder cases, be transferred to this Court. *State v. Thornton*, 253 Ga. 524 (1) (322 SE2d 711) (1984). We conclude that we do have jurisdiction of this appeal and that the dissenters' position is contrary to *Thornton* and its progeny.

1. In *Thornton*, this Court instructed the Court of Appeals to transfer all murder cases, "and all pre-conviction appeals in murder cases," to this Court. Over the next 25 years, this Court, and the Court of Appeals, adhered to this instruction, whether or not "the judgment at issue is pre-conviction,"[1] or the "appeal arises from a collateral order."[2] Thus, if "the murder count of the indictment remains pending below, jurisdiction of [the] appeal lies in this Court."[3]

The proper focus is "on the nature of the underlying action."[4] If the underlying action is a murder case, this Court has jurisdiction of the appeal, regardless of whether the order being appealed is based on facts having some bearing on the underlying criminal trial. Thus, this Court exercised jurisdiction in a murder case where a newspaper reporter appealed from an order ruling that the reporter's qualified privilege was inapplicable.[5] Likewise, we exercised jurisdiction where, in the midst of a murder prosecution, a television station was denied media access.[6]

Although the appeal in this case arises from a collateral order of contempt, it is undisputed that the nature of the underlying action is a criminal prosecution. It follows that the order of contempt is a matter lying within this Court's jurisdiction.

2. It now appears that the order granting the emergency motion for supersedeas was moot at the time it was entered. Accordingly, the original order is hereby vacated.

*Order granting emergency supersedeas vacated. All the Justices concur, except Hines, Melton and Nahmias, JJ., who dissent.*

CARLEY, Presiding Justice, concurring.

In *State v. Thornton*, 253 Ga. 524 (1) (322 SE2d 711) (1984), this Court ordered the Court of Appeals " 'to transfer to the Supreme Court all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, *and all pre-conviction appeals in murder cases* . . . .' [Cit.]" (Emphasis supplied.) Justice Nahmias views that order as an exercise of our constitutional certiorari jurisdiction. Furthermore, the language of Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8), placing appellate

---

[1] *Sanders v. State*, 280 Ga. 780, 782 (1) (631 SE2d 344) (2006); *Langlands v. State*, 280 Ga. 799 (1) (633 SE2d 537) (2006).

[2] *In re Paul*, 270 Ga. 680, 683 (513 SE2d 219) (1999).

[3] *Langlands*, supra, 280 Ga. 799 (1) (citations omitted). See also *Waits v. State*, 282 Ga. 1 (644 SE2d 127) (2007).

[4] *In re Paul*, supra.

[5] Id.

[6] *WALB-TV v. Gibson*, 269 Ga. 564, n. 2 (501 SE2d 821) (1998).

jurisdiction in this Court over "[a]ll cases in which a sentence of death was imposed or could be imposed[,]" may be broad enough to include appeals in all murder cases.

Regardless of the precise basis for the order in *Thornton*, it has provided a practical, bright-line rule which continues to serve both Georgia appellate courts well. As the controlling precedent cited in the majority opinion makes clear, *Thornton* includes all collateral orders which are entered in the context of a pending murder prosecution. Exclusion of certain contempt orders on the ground that they do not sufficiently affect the underlying murder trial would destroy the benefits of *Thornton*'s bright-line rule. Because there exists absolutely no basis under our precedent to transfer this appeal from a contempt order in the context of a pending murder prosecution, I fully concur in the majority opinion.

MELTON, Justice, dissenting.

This Court's jurisdiction is strictly limited by our state's constitution. In its opinion, the majority judicially rewrites our constitutionally-mandated jurisdiction to include the present case. Because this Court lacks the authority to edit our constitutional jurisdiction in this way, I must respectfully dissent, as I did to the original order which is now being vacated.[7]

The record shows that, on October 6, 2009, the trial court issued an oral order finding Assistant District Attorney Linda Dunikoski in contempt of court and ordering her to pay a $100 fine for violating certain agreed-upon rules of conduct in that particular courtroom. More specifically, the trial court found that Dunikoski disrespectfully argued with the trial court after it entered a certain ruling in a murder case Dunikoski was prosecuting. After discovering that Dunikoski had not paid the fine, apparently at the direction of the District Attorney, the trial court reduced the order to writing on November 12, 2009, ordering Dunikoski "to comply with [the] original order entered on October 6, 2009 by close of business on

---

[7] The style of this case ("S10M0390. THE STATE v. MURRAY") belies the nature of this action, which was initially captioned as "In re ADA Linda Dunikoski." The judgment of contempt at issue in this matter is a personal judgment against Dunikoski, and any ensuing litigation must be between the trial judge imposing the contempt and the attorney against whom the personal judgment has been entered. In fact, under OCGA § 5-7-1, the State has no right to appeal a contempt judgment against an assistant district attorney. Moreover, the trial court's role in the litigation is illustrated by the rule that a trial judge who alleges an attorney is in criminal contempt for behavior in his or her courtroom must transfer the case to another judge to hear the charges if "the announcement of punishment is delayed, and [if] the contumacious conduct was directed toward the judge or .where the judge reacted to the contumacious conduct in such manner as to become involved in the controversy." *Dowdy v. Palmour*, 251 Ga. 135, 142 (2) (c) (304 SE2d 52) (1983).

December 14, 2009." The trial court also ordered that Dunikoski be taken into custody and set a $100 signature bond as part of the November 12, 2009 order. In response to this order, the District Attorney's office filed the subject emergency motion for supersedeas in this Court.

Nothing in this factual scenario triggers this Court's jurisdiction. "Cases involving contempt of court are not within this Court's appellate jurisdiction." *Nowlin v. Davis*, 278 Ga. 240, n. 1 (599 SE2d 128) (2004). This is true because "[u]nder article 6, section 2, paragraph 5, of the [Georgia] constitution . . . , the Supreme Court has jurisdiction of certain enumerated cases; and [a contempt action is] not . . . within such enumerated cases." *Vines v. State*, 194 Ga. 442 (21 SE 853) (1942).

The mere fact that a finding of contempt is issued during a murder trial does not alter this constitutionally-imposed jurisdictional limitation. This is evident from this Court's finding in *Holmes v. State*, 224 Ga. 553, 567 (24) (163 SE2d 803) (1968), that "[i]t is not necessary to consider [the] ground [that defense counsel had been held in contempt of court] because the contempt proceeding is separate from [the] appeal, which involves only the [murder] trial of the appellant." As in *Holmes*, the trial court's finding of contempt in this matter has no relation to the underlying murder case. Substantively and legally, it is a separate matter based on facts which have no bearing on the criminal trial during which Dunikoski's behavior occurred. In fact, the contempt judgment in this case is a personal judgment against Dunikoski, and neither the State nor Murray are proper parties to this appeal. See note 7, supra. Therefore, this Court has no jurisdiction over this matter.[8]

None of the cases cited by the majority changes this result. As an initial matter, this case falls outside of the general rule that "the appellate court with subject-matter jurisdiction of the appeal from a judgment has appellate subject-matter jurisdiction of a contempt action in which enforcement of the judgment is sought." *Rogers v. McGahee*, 278 Ga. 287, 288 (1), n. 1 (602 SE2d 582) (2004). All that is presently before this Court is a judgment of contempt against an Assistant District Attorney for which this Court does not have

---

[8] As the concurrence points out, since 1983, our constitution has provided that this Court has appellate jurisdiction over "[a]ll cases in which a sentence of death was imposed or could be imposed." Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8). This provision, however, in no way supports the concurrence's strained conclusion that this Court has jurisdiction over the present contempt action, as an action for contempt such as the one before us is simply not or incident to a murder case subject to possible punishment by death, whether pre-conviction or post-conviction. As a result, we lack jurisdiction under our constitution.

original jurisdiction, not a judgment of murder against a defendant or a pre-conviction appeal involving the crime of murder. For this reason, *State v. Thornton*, 253 Ga. 524 (1) (322 SE2d 711) (1984) (pre-conviction appeals in murder cases such as appeal of motion to suppress evidence must be reviewed by Supreme Court), has no application in this context.

Furthermore, the remaining cases cited by the majority are equally unpersuasive and easily distinguishable. The bulk of these cases deal with appeals in murder cases which directly affect the rights of the defendant and are, therefore, directly related to the murder trial. In both *Waits v. State*, 282 Ga. 1 (644 SE2d 127) (2007) and *Langlands v. State*, 280 Ga. 799 (633 SE2d 537) (2006), the defendants, who were charged with multiple crimes, received a new trial on their murder and felony murder charges, but not the remaining charges against them (such as aggravated assault). This Court found that it could consider appeals of the remaining charges because the murder charges remained pending below. In *Sanders v. State*, 280 Ga. 780 (631 SE2d 344) (2006), the State brought two murder indictments against the defendant, one which sought the death penalty and one which did not. The State subsequently entered an entry of nolle prosequi to the indictment not seeking the death penalty, and the defendant was allowed to appeal the propriety of the State's action as it involved his indictment for murder. Again, this matter was directly related to the murder trial and the rights of the defendant. Therefore, a brief review of the facts in these cases, which the majority omits, shows that they simply have no application to this matter.

The majority's reliance on *In re Paul*, 270 Ga. 680 (513 SE2d 219) (1999) and *WALB-TV v. Gibson*, 269 Ga. 564 (501 SE2d 821) (1998) is also misplaced for similar reasons. Both of these cases are based on the collateral order doctrine which allows the direct appeal of a collateral order "because the issue is substantially separate from the basic issues presented in the complaint, an important right may be lost if review had to await final judgment, and nothing further in the underlying action can affect the issue on appeal." *Paul*, supra, 270 Ga. at 683. In *Paul*, a newspaper reporter had been subpoenaed to testify regarding unpublished information obtained during an interview with a defendant currently on trial for murder. The reporter asserted privilege under OCGA § 24-9-30, but the trial court ruled that the privilege did not apply. We allowed this ruling to be appealed as a collateral order based on the following findings:

> Because of the collateral nature of the reporter's privilege issue in most cases, we conclude that reporters who are not parties in the underlying action should not have to wait

until the case is concluded before appealing an order that requires them to disclose information. The disclosure order typically is a final decision concerning the news reporter. In this case, for example, the order rejecting the privilege claim and compelling Paul to answer the interrogatories is a final order concerning him as a non-party, unlike the usual discovery order. Moreover, the issue of whether a reporter should be compelled to reveal information is separate from the principal issue in a criminal trial of whether the accused is guilty of the crime charged in the indictment. Furthermore, the public interest in a free press would be irreparably harmed if review of the order compelling disclosure had to await a jury verdict in the murder case. Either the reporter would have already revealed the information or been imprisoned for failing to obey the disclosure order. Therefore, we hold that non-parties engaged in news gathering may file a direct appeal of an order denying them the statutory reporter's privilege under the collateral order exception to the final judgment rule.

Id. at 683. When the full holding of *Paul* is considered, rather than small excerpts, it becomes clear that it does not support the majority's conclusions. It was necessary in *Paul* to consider the collateral order to prevent irreparable harm to the sweeping constitutional rights of the public to a free press. No such rights are involved in this contempt action imposing a $100 fine.

Likewise, *WALB-TV*, supra, involved a collateral order touching upon the rights of the public to a free press. Specifically, we considered as a collateral order the trial court's ruling that a television station would not be granted access to a murder trial. These issues, of course, raise similar concerns for the constitutional rights of the public as in *Paul*. Moreover, in *WALB-TV*, "[t]he order at issue was entered in the context of a murder prosecution and the court below ruled that *the defendants' constitutional rights would be affected* by the requested access." (Emphasis supplied.) *WALB-TV*, supra, 269 Ga. 564, n. 2. Therefore, based on possible constitutional harm to the defendant, we found that the appeal was "properly before this Court pursuant to Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (8)." Id. Again, a full review of the facts and holding in *WALB-TV* proves that the majority is citing it in a selective, out-of-context manner and, thereby, reaches an unwarranted and unconstitutional result.

For all the reasons set forth above, the majority now unnecessarily rewrites this Court's constitutionally-imposed jurisdiction based on distinguishable case law. This Court has no authority to do

so, and this case should be transferred to the Court of Appeals.

I am authorized to state that Justice Hines joins in this dissent.

NAHMIAS, Justice, dissenting.

1. The emergency application for supersedeas at issue in this matter is clearly moot and ultimately will be dismissed. The issue that divides us is whether that dismissal order, like the order granting supersedeas in the first place, should be issued by the Supreme Court or the Court of Appeals. Assuming the validity of this Court's jurisdiction over murder cases "and all pre-conviction appeals in murder cases" under *State v. Thornton*, 253 Ga. 524 (322 SE2d 711) (1984), I believe that is a close question. I dissent because I agree with Justice Melton that the appeal underlying the supersedeas motion is too collateral to the murder case in which it happened to arise for our jurisdiction to rest upon *Thornton*, and we have no other reason for taking jurisdiction. The appeal involves a contempt action in which the parties are the lawyer who received the contempt order and the trial judge who issued it, neither of whom are parties in the underlying murder case (despite the caption by which our Court docketed the appeal). The decision on appeal will have no effect whatsoever on the murder case, and we therefore should transfer the matter to the Court of Appeals to address, as that court has previously addressed similar appeals of contempt orders against attorneys arising from murder cases, see *In re Butterfield*, 265 Ga. App. 745 (595 SE2d 588) (2004); *In re Healy*, 241 Ga. App. 266 (526 SE2d 616) (1999); *Farmer v. Holton*, 146 Ga. App. 102 (245 SE2d 457) (1978), and as we did back when our jurisdiction over murder convictions was unquestioned, see *Holmes v. State*, 224 Ga. 553, 567 (163 SE2d 803) (1968).

2. I write separately to explain my views regarding the validity of *Thornton*, pursuant to which this Court, rather than the Court of Appeals, has taken jurisdiction over all murder cases — hundreds and hundreds of such cases — for the past 25 years. For a case with such significant consequences, *Thornton* provides little reasoning for its holdings, and the little reasoning it does provide should appear troubling, at first glance, to anyone who believes that courts in our democratic system of government have only the jurisdiction to decide cases that is granted to them by the people through our Constitution. As discussed below, however, upon closer examination I believe the holding in *Thornton* can be defended and should be followed. Because Justice Melton's dissent ultimately argues that we *cannot* expand *Thornton* to take jurisdiction of this contempt action, rather than simply that we *should not* do so, I agree with his result but not all of his reasoning, and therefore I do not join his dissenting opinion.

(a) Under the 1945 and 1976 Georgia Constitutions, this Court

had jurisdiction over cases involving murder *convictions*, because murder was (and is) a "capital felony." See Georgia Constitution of 1945, Art. VI, Sec. II, Par. IV (jurisdiction of Supreme Court includes "all cases of conviction of a capital felony"); Georgia Constitution of 1976, Art. VI, Sec. II, Par. IV (same); *Collins v. State*, 239 Ga. 400, 402-403 (236 SE2d 759) (1977) ("capital felony" means " 'felonies to which the death penalty is affixed as a punishment under given circumstances,' " as opposed to felonies " 'in which under no circumstances would death ever be inflicted as a penalty' ") (citation and emphasis omitted). Our current Constitution changed that provision to grant this Court jurisdiction over only "[a]ll cases in which a sentence of death was imposed or could be imposed." Georgia Constitution of 1983, Art. VI, Sec. VI, Par. III (8).

The jurisdictional discussion in *Thornton* begins as follows:

> The district attorney did not give timely notice to the defense that the state intended to seek the death penalty, . . . and for this reason this is not a case "in which a sentence of death was imposed or could be imposed." . . . Hence, this appeal was filed properly in the Court of Appeals.

253 Ga. at 524 (citations omitted). While summary, this holding — that our Court now lacks direct appeal jurisdiction over murder cases in which the death penalty can no longer be imposed (which includes, a fortiori, murder cases in which the death penalty was sought but a non-capital sentence was imposed) — is consistent with the language of the new constitutional text and, to my knowledge, it has not previously been questioned in our cases.[9]

Having held that non-capital murder cases are properly appealed

---

[9] Thus, the 1983 Constitution has been interpreted in *Thornton* and elsewhere to provide this Court with jurisdiction over *pre-conviction* appeals in death penalty cases, rather than over only appeals from capital felony *convictions* as under the prior constitutions — but *not* to provide jurisdiction, either before or after conviction, over murder cases in which the death penalty can no longer be imposed. See *Weatherbed v. State*, 271 Ga. 736, 739-741 (524 SE2d 452) (1999) (Benham, C. J., concurring specially). However, despite *Thornton*'s summary holding to the contrary and the cases that follow that holding see, e.g., *Rhyne v. State*, 264 Ga. 176, 176 (442 SE2d 742) (1994) (holding that the Court of Appeals has jurisdiction over murder cases under the Constitution, even if *Thornton* directs such cases to be transferred to the Supreme Court), the "[a]ll cases in which a sentence of death . . . could be imposed" language used in the 1983 Constitution may also be read to include all murder cases, and indeed the records of the Select Committee on Constitutional Revision, which drafted that language, provide considerable support for the view that it *was* intended to continue our direct appeal jurisdiction over murder cases. I will not review those lengthy records in this opinion, because we can properly retain jurisdiction over murder cases under our certiorari jurisdiction and *Thornton*'s order and there are stare decisis reasons for simply continuing that approach.

to the Court of Appeals, the *Thornton* Court then stated the following:

> As a matter of policy, however, we deem it appropriate, at the present time, that all murder cases be reviewed by this court. Accordingly, we adopt today the following order: "The Court of Appeals is directed to transfer to the Supreme Court all cases in which either a sentence of death or of life imprisonment has been imposed upon conviction of murder, and all pre-conviction appeals in murder cases, whether or not timely notice was given by the district attorney as required by Unified Appeal § II. A. 1., 246 Ga. at A-7. This order shall be effective as to cases docketed in the Court of Appeals after December 1, 1984." *Collins v. State*, 239 Ga. 400, 403 (3) (236 SE2d 759) (1977).

253 Ga. at 524.

This is a troubling holding, particularly for a matter affecting so many of the most significant criminal cases in this State. There is no discussion of or citation of authority for the proposition that this Court can obtain jurisdiction over cases "[a]s a matter of policy" — a proposition seemingly at odds with the fundamental principle underlying our democratic system of government, in which the judicial branch, like the legislative and executive branches, has only the power granted to it by the people through their Constitution. Indeed, even the legislature cannot confer jurisdiction on this Court beyond the limits of the Constitution. See, e.g., *Collins*, 239 Ga. at 401-402 (" 'The jurisdiction of the Supreme Court is declared by the Constitution . . . and the legislature is without power by mere enactment to confer jurisdiction upon the Supreme Court to decide questions that are not of the class to which the jurisdiction of the Supreme Court is limited by the constitution.' ") (quoting *American Mills Co. v. Doyal*, 174 Ga. 631, 631 (163 SE 603) (1932)). To make matters worse, the policy considerations supposedly supporting the holding are not identified.

(b) Yet despite my initial reservations, I have reached the conclusion that *Thornton*'s jurisdictional holding and order can be supported by the Constitution and this Court's precedent. The basis for our jurisdiction is not some assertion of "inherent authority" to create jurisdiction based solely on policy considerations (an assertion I reject) or our authority over appeals in death penalty cases (which would, at minimum, require us to overrule several precedents). Instead, we may properly take all murder appeals as a categorical exercise of our longstanding and almost-unlimited *certiorari* jurisdiction.

This conclusion begins with a 1916 constitutional amendment,

ratified a few years after the creation of the Court of Appeals, which read:

"It shall also be competent for the Supreme Court to require by certiorari or otherwise any case to be certified to the Supreme Court from the Court of Appeals for review and determination with the same power and authority as if the case had been carried by writ of error to the Supreme Court."

Georgia Constitution of 1877, Art. VI, Sec. II, Par. V (amended 1916). See *State v. Tyson*, 273 Ga. 690, 696, n. 23 (544 SE2d 444) (2001) (Benham, C. J., concurring in part and dissenting in part). This amendment was intended to ensure that the Supreme Court had ultimate authority to decide all cases in this State, despite the division of direct appeals between this Court and the Court of Appeals. See id. at 696 & n. 24. The same broad language authorizing review by this Court of "any" case from the Court of Appeals "by certiorari or otherwise" was included in the Constitutions of 1945 and 1976, appearing just after the grant of direct appeal jurisdiction over several specific types of cases (including capital felony convictions). See Georgia Constitution of 1945, Art. VI, Sec. II, Par. IV; Georgia Constitution of 1976, Art. VI, Sec. II, Par. IV.

In several cases interpreting that language in the last few years in which these constitutions had effect, we held, without dissent on this point, that:

This court has the constitutional authority to require, by certiorari or otherwise, any case to be certified from the Court of Appeals, Const. Art. VI, Sec. II, Par. IV; Code Ann. § 2-3104, even before it is decided by that court, *Collins v. State*, 239 Ga. 400 (3) (236 SE2d 759) (1977), and without any application for certiorari being filed. *Collins v. State*, supra. Having the case before us, in its discretion this court can consider any matter presented to or decided by the Court of Appeals.

*Daniels v. State*, 248 Ga. 591, 591, n. 1 (285 SE2d 516) (1981). Accord *Patterson v. State*, 248 Ga. 875, 875, n. 1 (287 SE2d 7) (1982). The exercise of the Court's discretion to take cases from the Court of Appeals, as authorized rather than restricted by the Constitution, may of course be guided by policy considerations.

In *Collins*, the Court exercised this authority on a categorical instead of a case-by-case basis. In 1977 the General Assembly had enacted a statute purporting to expand the Supreme Court's direct

appeal jurisdiction to include three new types of cases (cases involving state revenues, election contests, and cases in which the constitutionality of ordinances is questioned). See 239 Ga. at 400. The Court held that the legislature had no authority to enlarge our constitutional jurisdiction, rendering the 1977 statute void. Id. at 401-402. The Court then decided, however, "[t]o effectuate the legislative intent" by ordering the Court of Appeals to *transfer* those three types of cases to the Supreme Court for review. Id. at 403. The basis for that categorical order is not stated in *Collins*, but it was explained later in *Daniels* and *Patterson* (and by Justice Hill in the meetings leading to the 1983 Constitution, as discussed below) to be the Court's certiorari jurisdiction, and it fit fairly within the applicable constitutional language. *Thornton* directed the same sort of categorical, pre-filing grant of certiorari review regarding all appeals in murder cases, and indeed *Collins* is the only case cited in *Thornton*'s jurisdictional discussion.

This does not end the analysis, however, because between the decisions in *Collins* in 1977 and *Thornton* in 1984, the people of Georgia ratified the Constitution of 1983. That Constitution reorganized and modified to some extent the provisions regarding this Court's jurisdiction, including the change from authority over all "cases of conviction of a capital felony" to only death penalty cases, as recognized at the beginning of *Thornton*, and the conferring of new direct appeal jurisdiction over two of the three categories of cases at issue in *Collins* (election contests and cases in which the constitutionality of ordinances is questioned). See generally Georgia Constitution of 1983, Art. VI, Sec. VI, Pars. II and III. The broad language allowing the Supreme Court to take jurisdiction "by certiorari or otherwise [over] any case" in the Court of Appeals was also modified, to now read simply: "The Supreme Court may review by certiorari cases in the Court of Appeals which are of gravity or great public importance." Id., Art. VI, Sec. VI, Par. V.

It could be argued that this new language was intended to narrow the Supreme Court's previously recognized and exercised plenary authority to take jurisdiction of cases, and even categories of cases, from the Court of Appeals. But that is not apparent from the text, which appears simply to be a shorter and clearer statement of the Court's general certiorari jurisdiction (along with the addition of the standard, "gravity and great public importance," approximating the one traditionally used by the Court in granting certiorari, see, e.g., *Orkin v. State*, 239 Ga. 334, 335 (236 SE2d 576) (1977); *Central of Georgia Ry. Co. v. Yesbik*, 146 Ga. 620 (91 SE 873) (1917)).[10]

---

[10] The term "certiorari" is not limited to review of any type of case, but refers simply to

This interpretation is also consistent with the brief discussion of the new constitution's phrasing that I have found in the records of the Select Committee on Constitutional Revision that drafted the document. Earlier drafts would have limited this Court's certiorari review to "*decisions* of the Court of Appeals." See, e.g., State of Georgia, Select Comm. on Constitutional Revision, 1977-1981, III Comm. to Revise Article VI, Transcripts of Meetings, Draft of Proposed New Judicial Article Considered at Meeting of Committee to Revise Article VI held on October 3, 1980 at 5 (emphasis supplied). That language was amended, however, to permit certiorari of "*cases* in the Court of Appeals." Id., Full Committee Meeting, Oct. 3, 1980, at 102 (emphasis supplied).

Judge Beasley explained the need for this change:

It was brought to my attention that very — not very often, but sometimes now in cases of great public importance the supreme court doesn't wait until there is a decision of the court of appeals, they take it by cert right away so that you don't have double consideration of the merits of the case, and it saves a lot of time.

Id. at 102. Justice Hill then explained further, referring to the Court's order in *Collins*:

As Judge Deen indicated a few minutes ago, we already are taking election contest cases by a rule, or not a rule, an order simply saying that we will grant certiorari in election contest cases. If it's — if we can only review the decisions of the court of appeals then we couldn't have such a standing order because the case would not be ripe for certiorari until after the court of appeals had rendered their decision, so that this — if you were to have a two governors case or some huge financial institution that failed and you knew it was going to have to be decided ultimately in the supreme court, no point in making it be decided first in the court of appeals.

Id. at 102-103.

Thus, there was specific discussion, in the context of the Court's certiorari jurisdiction, of the Court's authority to review cases before decision by the Court of Appeals and to do so by standing order applying to a category of cases. Judge Beasley's amendment, intended to continue that authority, was adopted without objection, id.

the common law writ issued by a higher court to a lower court requiring the latter to produce a certified record. See Black's Law Dictionary (8th ed. 2004).

at 103, and the revised language was ratified as part of the 1983 Constitution.

This understanding is reinforced by the unanimous opinion issued in *Thornton* just a year after the 1983 Constitution took effect, by Justices who had been directly involved in the framing of that Constitution and who appeared to take such continued authority as a given. It is supported further by at least two subsequent opinions in which this Court expressly recognized such authority, without dissent on the point. See *Cheeley v. Henderson*, 261 Ga. 498, 500 (405 SE2d 865) (1991) (citing the 1983 Constitution and pre-1983 cases that relied on the 1976 Constitution); *Tyson*, 273 Ga. at 692 ("The Constitution of the State of Georgia of 1983 gives the Supreme Court the power to 'review by certiorari cases in the Court of Appeals which are of gravity or great public importance.' This constitutional provision places no limit on this Court's certiorari jurisdiction.") (footnote omitted); id. at 694 (Carley, J., concurring) ("I fully agree with [the relevant division] of the majority opinion"); id. at 696, 701-702 & n. 31 (Benham, C. J., concurring in part and dissenting in part) (agreeing that "the General Assembly would be treading on constitutionally-shaky ground if it passed a law that limited this Court's authority to use the writ of certiorari to review any Court of Appeals' case" in the Court's discretion, while arguing that legislation may limit the State's right to seek such review, and noting that "this Court may rely on its constitutionally-based power to review by writ of cert. any case from the Court of Appeals," despite statutes and court rules to the contrary and "regardless of whether or not a petition for cert. has been filed").

Despite *Thornton*'s unfortunately summary holding, when understood as an exercise of this Court's discretion, pursuant to its certiorari jurisdiction, to require any specific case or class of cases to be transferred to this Court from the Court of Appeals, the decision in *Thornton* is defensible.[11] Murder cases are by their nature "of gravity [and] great public importance," Georgia Constitution of 1983, Art. VI, Sec. VI, Par. V. Thus, this Court might grant review on certiorari in many or even most murder cases if they went first to the Court of Appeals for decision, and it serves the interests of judicial

---

[11] Technically, the proper procedure for this Court to exercise its certiorari jurisdiction over non-capital murder cases would be to have them first docketed in the Court of Appeals and then formally transferred to this Court pursuant to *Thornton*'s order. See *Collins*, 239 Ga. at 403 (ordering that the three types of cases at issue there "should be docketed in the Court of Appeals from which they will be transferred for review to this court"). While that process still happens on occasion, over time most appeals in murder cases have come to be filed directly in this Court. It seems unwise to insist at this point on a procedural step that would simply create more work for the Court of Appeals and more delays in resolving appeals of murder cases.

economy and of seeking finality in murder judgments to skip that intermediate review. See *Tyson*, 273 Ga. at 693 (allowing the State to seek certiorari review in any criminal case, rather than only those specified by statute, because of "the importance of the issues to the public"). In addition, given the current structure of Georgia's appellate system, it was and is not unreasonable for this Court to take the burden of reviewing murder cases from the Court of Appeals.[12]

This is not to say that *Thornton*'s order taking jurisdiction of all murder cases, when properly understood as a discretionary decision, could not be changed. Indeed, in 1999, then-Chief Justice Benham argued strongly, 15 years after *Thornton*, that "the time has come for this Court to comply with the change in its appellate jurisdiction in non-capital murder cases brought about by passage of the 1983 Georgia Constitution, as recognized in *State v. Thornton*." *Weatherbed*, 271 Ga. at 739 (Benham, C. J., concurring specially). In 1995, the Court had taken a similar step in reversing the remaining portion of its *Collins* order. See *Collins v. American Telephone & Telegraph Co.*, 265 Ga. 37, 38 (456 SE2d 50) (1995) (noting that the 1983 Constitution expressly gave the Supreme Court jurisdiction over election contests and questions of the constitutionality of ordinances but not over state revenue cases, and therefore reversing the 1977 *Collins* order transferring state revenue cases to this Court to effectuate "the intent of the legislature in drafting the new constitution that this court not have appellate jurisdiction over cases involving revenues of the state"). Justice Benham's suggestion, however, had no other takers on the Court then and does not appear to have generated any substantial efforts by litigants, commentators, or the General Assembly to push the Court in that direction. To the contrary, almost everyone appears to accept the system put into place in *Thornton* and, as noted in footnote 9 above, the order issued in *Thornton* may actually effectuate the intent of the 1983 Constitution.

Because I believe that *Thornton* is based upon a reasonable

---

[12] In this respect, although we have to guess at the policy reasons underlying *Thornton*, I note that the opinion came shortly after the 1977 decision in *Collins*, which recognized that jurisdiction over a large number of other major criminal cases that had once been "capital felonies" appealed to this Court – all rape, kidnapping, and armed robbery cases – now lay in the Court of Appeals. It may have been seen as simply too much to allow the 1983 Constitution's revision eliminating the Supreme Court's direct appeal jurisdiction over non-capital murder cases to move all those cases to the Court of Appeals as well (assuming, as *Thornton* held, that this was the effect of the new Constitution, but see footnote 9 above). We are now a quarter-century down the road, and perhaps these considerations have changed, but there are also 25 years of reliance interests built into budgets, timetables, and other expectations regarding which court will expend the time and resources hearing appeals in murder cases.

application of our constitutional certiorari jurisdiction, and in the absence of concerted arguments for changing our approach to murder cases, I agree that the *Thornton* order should remain the law.

3. I have discussed the validity of *Thornton* at length because its order affects such a large component of this Court's docket and no prior opinion I have found presents a clear and defensible rationale for that order — including the majority opinion in this case, which states that this case compels the Court "to re-examine our long-standing order" in *Thornton*, Majority opinion p. 258, but then simply treats that order as a given. While I accept *Thornton* as good law, a contempt action involving an attorney who happened to be trying a murder case at the time of the alleged contempt, but which does not involve the interests of the defendant or the State in that case, does not come within the scope of *Thornton*'s order or otherwise within our direct appeal jurisdiction, largely for the reasons expressed by Justice Melton. This is not a "pre-conviction[ ] appeal in [a] murder case[ ]," *Thornton*, 253 Ga. at 524. Rather, it is an appeal of a separate action involving two different parties.

Under the same certiorari authority on which the *Thornton* order rests, I believe we *could* expand that order to encompass appeals of all contempt actions arising during murder cases, no matter how tangential. It is on this point that I differ from Justice Melton. But I do not believe that such an expansion would be appropriate, as contempt orders not affecting the underlying murder case neither presumptively involve issues of gravity and great public importance nor impose significant burdens on the Court of Appeals. We are chary in granting certiorari in general, and we should continue to be extremely cautious about exercising our authority to review specific cases, much less categories of cases, before a decision by the Court of Appeals and the filing of a petition for certiorari through the usual procedures. Moreover, such an expansion of *Thornton* would be inconsistent with our decision in *Holmes v. State*, supra, and with the approach the Court of Appeals has taken in similar contempt appeals. I do not believe that the practical interest in establishing a "bright-line rule," the rationale of Presiding Justice Carley's concurrence, is weighty enough to overcome these other considerations.

For these reasons, I respectfully dissent, and I would order that the supersedeas application be transferred to the Court of Appeals.

DECIDED DECEMBER 3, 2009.

*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Bettie-anne C. Hart, Assistant District Attorneys*, for appellant.

*Brian A. Hobbs, Leighton R. Berry, Jr.*, for appellee.