NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 24, 2025

S25A0191. COLEMAN v. THE STATE.
S25A0192. WALKER v. THE STATE.
S25A0199. COLEMAN v. THE STATE.
S25A0200. WALKER v. THE STATE.

COLVIN, Justice.

Appellants Timothy Coleman, Jr., and Tyriek D. Walker appeal their convictions and sentences for criminal contempt, which arise from their respective refusals to testify in the trial of fellow gang member Arthur Newton.[1] As described more fully below,

[1] The procedural history of these cases has led to two appeals from each of the Appellants. Coleman's cases and Walker's cases are discussed in succession below.

Dominique Powell was killed on September 12, 2016. On November 16, 2016, a Chatham County grand jury issued a 20-count indictment against Coleman for malice murder and other crimes related to Powell's death in trial court case number CR16-2126. The State then filed a notice of intent to seek the death penalty. Following a demurrer, Coleman was reindicted for the same crimes in trial court case number CR17-1279, and the trial court entered an order of nolle prosequi of the original case (CR16-2126). The State renewed its intent to seek the death penalty in CR17-1279 but later withdrew it. As a result of successful plea negotiations, the State sought and received an entry of nolle

prosequi of the second indictment, CR17-1279, and re-charged Coleman by means of a superseding three-count accusation for malice murder (Count 1), possession of a firearm during the commission of a felony (Count 2), and a violation of the Street Gang Terrorism and Prevention Act (Count 3). This accusation was assigned case number SPCR22-03626. Coleman entered a negotiated guilty plea to the crimes alleged in the accusation and received a sentence of life in prison with the possibility of parole for malice murder (Count 1), a consecutive sentence of 15 years to serve for violating the Street Gang Terrorism and Prevention Act (Count 3), and 5 years of probation for possession of a firearm during the commission of a felony (Count 2).

When Coleman refused to testify in Newton's trial, the trial court entered identical orders of contempt in the cases corresponding to Coleman's second indictment (CR17-1279) and his accusation (SPCR22 03626), even though CR17-1279 had been closed by entry of an order of nolle prosequi. Coleman has appealed from both orders.

The procedural history of Walker's cases is similar. On November 16, 2016, the same day that Coleman was indicted, a Chatham County grand jury issued a 12-count indictment against Walker for malice murder and other crimes related to Powell's death in case number CR16-2123. The State then filed a notice of intent to seek the death penalty. Like Coleman, Walker filed a demurrer, after which he was reindicted for the same crimes in case number CR17-1306, and the trial court entered an order of nolle prosequi dismissing the original case (CR16-2123). The State then renewed its notice of intent to seek the death penalty in case number CR17-1306 but later withdrew it. As a result of successful plea negotiations, the State sought and received an entry of nolle prosequi of Walker's second indictment, CR17-1306, and re-charged Walker by means of a superseding three-count accusation for conspiracy to commit murder (Count 1), influencing a witness (Count 2), and a violation of the Street Gang Terrorism and Prevention Act (Count 3). This accusation was assigned case number SPCR22-03708. Walker entered a negotiated guilty plea to the crimes alleged in the accusation and received a sentence of 10 years in prison for conspiracy to commit murder (Count 1), five years to serve concurrent with Count 1 for influencing a witness (Count 2), and a 20-year consecutive sentence, with ten years to be served on probation and ten years suspended, for violating the Street Gang Terrorism and Prevention Act (Count 3).

When Walker refused to testify in Newton's trial, the trial court entered identical orders of contempt in the cases corresponding to Walker's second indictment (CR17-1306), and his accusation (SPCR22-03708), even though

Newton was charged with malice murder and other crimes for ordering Coleman to kill Dominique Powell and for directing Walker to provide Coleman with material assistance. Prior to Newton's trial, Coleman pleaded guilty to malice murder and other crimes and Walker pleaded guilty to conspiracy to commit murder and to other crimes for their roles in Powell's death. Though Coleman and Walker had pleaded guilty to state charges, each asserted at Newton's trial that they remained in jeopardy of federal criminal prosecution for crimes arising from the same events, asserted their rights against self-incrimination under the Fifth Amendment of the United States Constitution, and refused to testify. The trial court convicted Coleman of 19 counts and Walker of 21 counts of criminal contempt — one count for each question that the trial court determined Appellants improperly refused to answer — and sentenced Appellants to 20 days in prison for each count, resulting

---

CR17-1306 had been closed by entry of an order of nolle prosequi. Walker has appealed from both orders.

Coleman and Walker's appeals were docketed to this Court's term beginning in December 2024 and were submitted for a decision on the briefs.

in sentences of 380 days for Coleman and 420 days for Walker.

On appeal, Coleman and Walker raise three issues. First, Appellants argue that the trial court erred by requiring them to testify over objection and by finding them in contempt for their refusals to do so. Second, Appellants argue that their respective convictions for contempt should have merged, such that each Appellant would be convicted and sentenced for only one count of contempt, rather than one count for each time they refused to follow a court order directing them to answer a question. Third, Walker (but not Coleman) argues that his consecutive sentences of 20 days in prison for each of his 21 counts of contempt violated the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution.

After review,[2] we conclude that the trial court erred by ordering Coleman to answer certain questions from the State regarding his

---

[2] We directed the parties to submit supplemental briefing regarding our jurisdiction over these appeals. After considering this briefing, we are satisfied that we have jurisdiction. See *Hart v. State*, __ Ga. __ (S25A0136) (Jun. 24, 2025); *In re Brinson*, 299 Ga. 859, 859 n.2 (791 SE2d 804) (2016); *State v. Murray*, 286 Ga. 258, 259 (1) (678 SE2d 790) (2009).

unsworn proffer, and by finding him in contempt for his refusals to answer them, because those questions sought testimony that could have further incriminated Coleman. Coleman's convictions of contempt for his refusals to answer questions about his proffer must therefore be reversed. We conclude that it was not error, however, for the trial court to order Appellants to respond to the State's other questions or for it to find Appellants in contempt when they refused to answer them after being directed to do so by the court. We must nevertheless vacate each of Appellants' remaining convictions and sentences and remand for the trial court to convict and sentence each Appellant for only one count of criminal contempt because Appellants' multiple refusals were part of a single session of examination in which they expressed a single, deliberate choice to exercise their rights in response to multiple questions. And because we vacate each of Walker's convictions and sentences for this reason, we do not reach his claim that subjecting him to multiple penalties for criminal contempt constituted cruel and unusual punishment.

1. (a) As stated above, Coleman and Walker each pleaded guilty

to crimes related to Powell's death. During their respective plea hearings, which occurred on the same day, the prosecuting attorney set out the following facts as the basis for their charges.

According to the prosecutor, Newton and his associate, Antwan Drayton, robbed Powell at gunpoint outside his home on September 6, 2016.[3] As Newton and Drayton fled the scene, Powell retrieved a firearm and shot at them, striking both. Newton was hospitalized with "serious but non-life-threatening injuries," and while there, he was arrested on an unrelated outstanding warrant. Newton was then incarcerated at the Chatham County Detention Center, where, on September 11, 2016, he was served with an arrest warrant for his role in Powell's armed robbery.

On the following day, September 12, 2016, Newton attended a bond hearing in which Powell appeared as a witness against him. After returning to the detention center, Newton used the jail's phone system — which was recorded — to contact Coleman and relay his

---

[3] Newton was later convicted of Powell's armed robbery and subsequent murder. Drayton was tried separately from Newton and convicted of armed robbery.

concerns that Powell would continue to appear and testify against him. Over the course of dozens of calls in quick succession, Newton reiterated his concerns and used his authority as a high-ranking member of a local set of the Bloods street gang to order his subordinate, Coleman, to kill Powell. At Newton's direction, Walker, who was also a member of the gang, provided Coleman with information about Powell's location. Using this information, Coleman shot and killed Powell at approximately 5:00 p.m. on a residential street in the Tatemville neighborhood of Savannah.

In exchange for their roles in Powell's killing, Newton promised Coleman money and property, and promised both Appellants increased status within the gang for their assistance.

As part of Appellants' plea negotiations, the State agreed to nol pros the 20-count indictment against Coleman and the 12-count indictment against Walker and recharge them by superseding accusations on only the crimes to which they had agreed to plead

7

guilty.[4]

Accordingly, Coleman was formally accused of malice murder (Count 1), possession of a firearm during commission of a felony (Count 2), and a violation of the Street Gang Terrorism and Prevention Act, and the State nol prossed Coleman's indictment in case number CR17-1279. Specifically, the accusation alleged that Coleman did unlawfully and with malice aforethought "cause the death of Dominique Powell . . . by shooting" Powell on September 12, 2016, and that, "during the commission of" this crime, Coleman "did unlawfully have within arm's reach of his person a handgun[.]" The accusation further alleged that Coleman "participate[d] in criminal gang activity through the commission of . . . malice murder" while "associated with a criminal street gang, to wit: [the] Bloods[.]"

Walker was formally accused of conspiracy to commit murder (Count 1), influencing a witness (Count 2), and a violation of the Street Gang Terrorism and Prevention Act (Count 3), and the State

---

[4] Appellants waived their rights to an indictment and agreed to proceed by formal accusation.

nol prossed Walker's indictment in case number CR17-1306. Count 1 of the accusation alleged that on September 12, 2016, Walker "unlawfully conspire[d] with Arthur Newton, [and] Timothy Coleman, Jr., . . . to commit the offense of murder" and that in furtherance of this conspiracy:

> A) Arthur Newton did contact Timothy Coleman and request that he kill Dominique Powell; B) Arthur Newton and Timothy Coleman did contact Tyriek Walker and request that Tyriek Walker provide a firearm to Timothy Coleman; C) Arthur Newton and Timothy Coleman did contact Tyriek Walker and request that Tyriek Walker provide . . . Dominique Powell's known addresses to Timothy Coleman; . . . [and] E) Timothy Coleman did shoot Dominique Powell[.[5]]

Count 2 of the accusation alleged that Walker "intentionally aid[ed] Timothy Coleman in committing the crime of influencing a witness by providing Dominique Powell's address to Timothy Coleman" and that Coleman then shot Powell with the intent of preventing Powell's testimony at Newton's trial. Lastly, the State alleged in

---

[5] It appears from the record that Newton directed Walker to provide Coleman with a firearm and information about Powell's address, but Walker ultimately only provided Coleman with Newton's address and did not provide Coleman with a gun.

Count 3 of the accusation that Walker "participate[d] in criminal gang activity through the conspiracy to commit . . . murder" while "associated with a criminal street gang, to wit: [the] Bloods[.]"

As part of his plea, Coleman also made a written proffer.[6] His proffer did not purport to be a sworn statement, and it included a proviso that "[t]his information is given with the understanding that it shall not be used in any capacity by any government agency against Mr. Coleman other than" in his pending state criminal proceedings. In his proffer, Coleman admitted that he was "involved with the West Coast Blood Gang[.]" He further admitted that he "learned that [Newton] had been shot" on September 8, and that "[over] the next few days [Coleman] learned that the shooting had occurred because of an attempted armed robbery." The proffer stated that Coleman "was informed that one of the people involved in the armed robbery was potentially talking with police[,]" and that "[i]n

---

[6] During Newton's trial, the State submitted an unsigned copy of Coleman's proffer together with a stipulation that Coleman has provided a signed proffer as a condition of his guilty plea and that the unsigned document was "accepted as a true and correct copy of the proffer executed at the plea of Timothy Coleman."

order to prevent this witness from testifying and to attempt to help [Coleman's] friend [i.e., Newton] evade prosecution[, Coleman] set about learning the witness's location." According to the proffer, Coleman "drove around Tatemville looking for Mr. Powell," and when he "saw Mr. Powell," Coleman "called him over to [his] vehicle[,] . . . shot him[,] and drove him off."

During their respective plea colloquies, the trial judge asked each Appellant if he was pleading guilty because he was, in fact, guilty. Each responded affirmatively. The trial judge also reviewed Appellants' rights with them, including their rights against self-incrimination. The trial court confirmed that Appellants had discussed these rights with their respective counsel, understood them, and waived them.

(b) At Newton's trial, the State called both Walker and Coleman to the stand, and their attorneys objected, raising the same arguments now raised on appeal. Specifically, Appellants' attorneys argued that compelling Appellants to testify would violate their rights under the Fifth Amendment because it would place them in

11

jeopardy of federal criminal prosecutions arising from the same underlying acts.

The trial court heard argument and considered a submission from the State of the questions it intended to ask.[7] These questions, which all concerned Appellant's roles in Powell's death, included (1) questions about the crimes to which Appellants had pleaded guilty; (2) questions about Appellants' guilty plea hearings; and (3) for Coleman only, questions about his factual proffer.[8]

---

[7] Though the appellate record does not contain the State's written submission to the trial court, we are able to deduce the contents of the submission because the trial court approved the State's questions; the State used the list of approved questions to examine Appellants; and there were no noted deviations.

[8] The State asked Walker 21 questions. The first 10 concerned the crimes to which he had pleaded guilty, and the remaining 11 questions concerned Walker's plea hearing. The State's questions were as follows:

1. "On September 12, 2016, did you aid Timothy Coleman in committing the crime of influencing a witness?
2. "Specifically, on September 12, of 2016, did you aid Timothy Coleman in influencing the witness of Mr. Dominique Powell?"
3. "And on September 12th, of 2016, did you aid Mr. Timothy Coleman in preventing Mr. Dominique Powell from being a witness in the trial of Arthur Newton?"
4. "[O]n September 12th, 2016, did you aid Timothy Coleman in preventing Mr. Powell from being a witness in the trial of Arthur Newton, by Mr. Timothy Coleman shooting Dominique Powell?"
5. "[O]n September 12, 2016, did you conspire with Arthur Newton, Timothy

Coleman, and Artez Strain to commit the offense of murder?"

6. "[O]n September 12th, 2016, did you[,] Arthur Newton, Timothy Coleman, [and] Artez Strain conspire to commit the murder of Mr. Dominique Powell?"

7. "[O]n September the 12th, 2016, Mr. Walker, did Arthur Newton and Timothy Coleman contact you and request you to provide a firearm to Timothy Coleman?"

8. "[O]n September 12th, 2016, . . . as part of your conspiracy with Arthur Newton and Timothy Coleman, did they contact you and request you to provide Mr. Powell's known addresses to Mr. Timothy Coleman?"

9. "[O]n September the 12th, 2016, while associated with the Bloods criminal street gang, did you participate in criminal gang activity?"

10. "More specifically . . . on September 12, 2016, did you participate in the criminal gang activity, specifically, conspiracy to commit murder?"

11. "[O]n December 30, 2022, did you enter a guilty plea to the offenses of conspiracy to commit felony murder, influencing a witness in violation of the Street Gang Terrorism and Prevention Act?"

12. "[P]rior to entering your guilty pleas on December 30, were you given an oath to give truthful answers to the court?"

13. "[W]hen asked by the court if you were pleading guilty because you are guilty, on that day to those charges, how did you respond?"

14. "[W]hen you entered these pleas, were you represented by counsel?"

15. "[W]hen you entered those guilty pleas on December 30, of 2022, were you represented by Mr. Sincox, who is here with you today?"

16. "[W]hen you entered your guilty pleas to those charges, were you asked by the court if you had sufficient time to discuss with your attorney any potential defenses that you might have to be able — to be available at trial?"

17. "[W]hen you entered your guilty pleas on December 30, of 2022, did the court ask you if you had sufficient time to discuss with your attorneys any potential witnesses that you might be able to call if you were to go to trial?"

18. "[O]n December 30, 2022, when you entered your guilty plea to those charges, were you asked by the court whether or not you and your attorney had discussed potential strategies that could be used during the course of the trial?"

19. "[W]hen you entered your guilty plea on December 30th, of 2022, were you asked by the court whether you had discussed with your attorney your decision to enter your guilty pleas on that day?"

20. "[W]hen you entered your guilty pleas on December 30, of 2022, were you asked by the court if the district attorney, your attorney, any law enforcement officer, or anybody else made any promises or threats to you, to get you to enter your plea that day?"
21. "[A]fter entering your guilty pleas on December 30, of 2022, to felony murder, influencing a witness in violation of the Street Gang Terrorism and Prevention Act, were you asked by the court if all your answers to their questions had been truthful?"

The State posed 24 questions to Coleman: questions 1-2 and 13-14 concerned the crimes to which Coleman pleaded guilty; questions 3-12 concerned his proffer; and questions 15-24 concerned his guilty plea hearing. These questions were as follows:

1. "Mr. Coleman, on September 12th, 2016, did you commit the crime of murder in Chatham County?"
2. "[D]id you on September 12th, 2016, commit the murder of Mr. Powell by shooting him?"
3. "[O]n December 30th, of 2022, the date you entered your guilty plea to the murder of Mr. Powell, did you proffer certain information to the State?"
4. "Did you proffer that on September 8th, you had learned that Arthur Newton had been shot?"
5. "[D]id you proffer that over the next few days that you had learned the shooting had occurred because of an attempted robbery?"
6. "[D]id you also proffer that one of the people involved in the armed robbery was potentially talking with police?"
7. "[D]id you proffer that in order to prevent that witness from testifying and to attempt to help your friend evade prosecution, you set about learning the witness's location?"
8. "[D]id you proffer that you learned the witness lived in Tatemville?"
9. "[D]id you also proffer that you learned the name of the witness was Dominique Powell?"
10. "[D]id you proffer that you drove around Tatemville looking for Mr. Powell?"
11. "[D]id you proffer that you made your way down Garey Avenue and you saw Mr. Powell and called him over to your vehicle?"

14

After review of these questions, the trial court found that "the

potentiality of future prosecution from the federal side is remote,"

12. "[D]id you proffer that when Mr. Powell approached your car and was close enough, you shot him and drove off?"
13. "[O]n September 12th, 2016, while associated with the criminal street gang, the Bloods, did you participate in criminal gang activity?"
14. "Specifically, the criminal gang activity that you participated [in] on September 12th, was that the murder of Mr. Dominique Powell?"
15. "[O]n December 30, of 2022, did you enter guilty pleas to the offenses of murder, possession of firearm during the commission of a felony, in violation of the Street Gang Terrorism and Prevention Act?"
16. "[P]rior to entering your guilty pleas to those charges on that day, were you given an oath to give truthful answers to the court?"
17. "[W]hen you entered your guilty pleas to those charges, were you asked by the court if you were pleading guilty because you are guilty?"
18. "[W]hen asked by the court if you were pleading guilty because you are guilty, did you respond, 'Yes, sir'?"
19. "[W]hen you entered your pleas of guilty on December 30th, 2022, did the court ask you if the district attorney, your attorney, any law enforcement officer, or anybody else made any promises or threats to you, to get you to enter your pleas?"
20. "[I]n response to the court asking you if the district attorney, your attorney, or any law enforcement officer, or anybody else made any promises or threats to you, to get you to enter your pleas, did you respond, 'No, sir'?"
21. "[W]hen you entered your guilty pleas on December 30, of 2022, were you asked by the court if you were doing so freely and voluntarily?"
22. "Mr. Coleman, after being asked if you were entering your pleas freely and voluntarily, did you respond, 'Yes, sir'?"
23. "Mr. Coleman, when you entered your pleas, after entering your pleas, were you asked by the court, 'Have all your answers to the court's questions been truthful[?]'?"
24. "Mr. Coleman, after being asked if all your answers to the court's questions have been truthful, did you respond, 'Yes, sir'?"

15

and that further state prosecution was precluded by statutes of limitation. The trial court then stated:

> Therefore, the Court makes a finding that there is no privilege against self-incrimination, with respect to the facts related to the charges to which the witnesses entered their pleas of guilty, nor with respect to any charge in the indictments for which the State dismissed or nol[ ] pros[s]ed particular charges for which statutes o[f] limitations have run.
>
> Further, the questions that have been posed by the State, the Court finds do not go outside of any of the issues or alleged crimes, with respect to what these witnesses have admitted or pled or have been dismissed by the State.
>
> And therefore, the witnesses are going to be directed to answer questions by the State, as well as by the defendant. And if they claim any privilege against self-incrimination, with respect to the question that's being asked, the Court is going to inform them they do not have that privilege, with respect to that question, and will instruct them to answer the question.
>
> In the event they refuse to do so, the Court will simply instruct the State or the counsel for the defendant to ask their next question. And we will go through that exercise, with respect to each question that the State, as well as the defendant, wish to ask.

Newton's trial then proceeded consistent with the trial court's instructions. The State called Walker to the stand and asked him 21

pre-approved questions, but Walker gave no responses, even after the trial court directed him to do so. The trial court then found Walker in contempt for failing to answer the State's questions and sentenced him to 20 days in prison for each unanswered question, for a total sentence of 420 days. Walker's counsel objected to the sentencing and asked the trial court to reconsider, but the trial court denied counsel's oral motion.[9]

The State then called Coleman to the stand and asked him a series of 24 questions concerning the crimes to which he pleaded guilty, his written proffer, and his testimony during his guilty plea hearing. In response to each question, Coleman responded, "I plead the Fifth." Each time, the trial court instructed him that he did not have that privilege and directed him to answer the question, but Coleman responded by repeating his prior plea. In assessing the extent of Coleman's contempt, the trial court found that five of the

---

[9] Walker's counsel did not specify the grounds for his motion, which the trial court immediately denied. The appellate record leaves unclear whether Walker's counsel was preparing to articulate the grounds of his objection and motion when the trial court ruled.

State's 24 questions were duplicative, without specifying to which questions it was referring. The trial court then found Coleman guilty of 19 counts of contempt for his refusal to answer the State's questions. Like Walker, Coleman was sentenced to 20 days in prison for each count of criminal contempt, resulting in a total sentence of 380 days.

2. Appellants argue that the trial court erred by compelling them to testify and for finding them in contempt for their subsequent refusals to do so. Specifically, Appellants argue that they were entitled to invoke their rights against self-incrimination under the Fifth Amendment because the State's questions sought testimony that would have placed them in jeopardy of further criminal prosecution under the federal murder-for-hire statute, 18 USC § 1958.[10] As we explain below, the court did not err by requiring

_____

[10] See 18 USC § 1958 (a) ("Whoever . . . uses . . . any facility of interstate . . . commerce, with intent that a murder be committed in violation of the laws of any State . . . as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do . . . shall be fined under this title or imprisoned . . . and, if death results, shall be punished by death or life in imprisonment, or shall be fined not more than $250,000, or both."); 18

Appellants to answer questions regarding the crimes to which they had pleaded guilty, as alleged in their accusations, or questions regarding what had occurred during their guilty plea hearings, but the trial court did err by requiring Coleman to answer questions about his proffer. We therefore reverse Coleman's contempt convictions corresponding to the State's questions about his proffer.

(a) We begin with the text of the Fifth Amendment, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment. See *Mallory v. Hogan*, 378 U.S. 1, 8 (84 SCt 1489, 12 LE2d 653) (1964). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. Amend. V. This privilege "protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law." *Murphy v. Waterfront Commission of New York*

USC § 1958 (b) (2) (explaining that the phrase "'facility of interstate or foreign commerce' includes means of . . . communication"). See also 18 USC § 3281 ("An indictment for any offense punishable by death may be found at any time without limitation.").

19

*Harbor*, 378 U.S. 52, 77-78 (IV) (84 SCt 1594, 12 LE2d 678) (1964). And it applies not only to testimony that would directly incriminate the witness, but also to testimony that would "furnish[ ] a link in the chain of evidence" needed to prosecute the witness for a crime. *Blau v. United States*, 340 U.S. 159, 161 (71 SCt 223, 95 LEd 170) (1951).

"The central standard for the privilege's application has been whether the claimant is confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination." *Marchetti v. United States*, 390 U.S. 39, 53 (III) (88 SCt 697, 19 LE2d 889) (1968) (citation and punctuation omitted). "As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a real danger of further crimination." *Rogers v. United States*, 340 U.S. 367, 374 (71 SCt 438, 95 LEd 344) (1951) (citation and punctuation omitted). This determination is made "in light of all the circumstances, including any previous disclosures." Id. "To sustain the privilege, it need only be evident from the implications of the question . . . that a responsive answer to the question . . . might be

20

dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486-487 (71 SCt 814, 95 LEd 1118) (1951). When a witness asserts his Fifth Amendment right and refuses to respond, it is error for a trial court to compel the witness's testimony unless it is "*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that [his] answer(s) *cannot possibly* have [a] tendency to incriminate." Id. at 488 (emphasis in the original) (reversing conviction for contempt where the witness refused to answer questions posed during a grand jury investigation because the questions "could easily have required answers that would forge links in a chain of facts imperiling petitioner with conviction of a federal crime").

(b) (i) We start with the prosecutor's questions about the crimes to which Appellants pleaded guilty. We conclude that the trial court did not err by compelling Appellants to answer these questions or by finding them in contempt for failing to respond, as these questions placed them in no additional jeopardy of criminal prosecution. By

21

way of example, Coleman's accusation charged him with malice murder "by shooting" Powell on September 12, 2016, and the prosecutor asked Coleman, "[D]id you on September 12th, 2016, commit the murder of Mr. Powell by shooting him?" It was not error to compel Coleman to answer this question, as a truthful affirmative answer could not "possibly" place him in any jeopardy beyond what pleading guilty to the crimes alleged in the accusation had already done. *Hoffman*, 341 U.S. at 488. See *Shepard v. Williams*, 299 Ga. 437, 441 (788 SE2d 428) (2016) ("A plea of guilty admits the facts set forth in an accusation or indictment[.]"); *Kemp v. Simpson*, 278 Ga. 439, 439 (603 SE2d 267) (2004) (holding that, by pleading guilty, the defendant had admitted a fact alleged in the indictment).

(ii) The same is true for the prosecutor's questions regarding Appellants' guilty plea hearings. As one example, during Walker's guilty plea, the trial court asked him, "Have you had sufficient time to discuss with your attorneys any potential witnesses that you might be able to call if you were to go to trial?" And at Newton's trial, the prosecutor asked Walker, "when you entered your guilty pleas

22

on December 30, of 2022, did the court ask you if you had sufficient time to discuss with your attorneys any potential witnesses that you might be able to call if you were to go to trial?" A close review of the prosecutor's other questions to Appellants about their guilty plea hearings follow the same pattern and did not require answers that would have placed Appellants in jeopardy beyond the jeopardy created by their sworn testimony at their guilty plea hearings, which had been transcribed and were part of the public record before Newton's trial.

Appellants argue that the factual basis provided by the prosecutor at Appellants' guilty plea hearings contained facts that could support a federal criminal charge under the murder-for-hire statute, 18 USC §1958 (a), because the prosecutor stated that Newton promised Appellants compensation for killing Powell. And they further argue that requiring Appellants to testify about their guilty plea hearings placed them in jeopardy of federal criminal prosecution under this statute. But while it is true that the prosecutor at their guilty plea hearings recited facts concerning

promises of compensation for killing Powell, the prosecutor in Newton's trial assiduously avoided asking Appellants questions on this topic. And by refraining from such questions, the prosecutor in Newton's trial avoided placing Appellants in additional criminal jeopardy under the single federal criminal statute that Appellants invoke. See 18 USC § 1958 (a). Thus, Appellants have failed to show that the trial court erred by requiring Appellants to answer questions regarding their guilty plea hearings or by finding them in contempt for failing to answer those questions when directed to do so by the court.

(iii) Questions regarding Coleman's proffer were different, however. The prosecutor's questions at Newton's trial hued closely to the language of Coleman's proffer, such that Coleman's responses to those questions would simply repeat facts already in the public record. But Coleman repeating those facts at Newton's trial would have been significantly more incriminatory than Coleman's proffer itself. This is because, as noted above, Coleman's proffer was unsworn, whereas his answers to the prosecutor's questions about

24

his proffer at trial would have constituted sworn testimony admitting his criminal conduct. And sworn admissions would be significantly more valuable to prosecutors in a federal criminal prosecution because sworn testimony is understood to carry more weight than unsworn statements. See *Roberts v. Dutton*, 368 F2d 465, 473–74 (5th Cir. 1966) ("[S]worn testimony is ordinarily ascribed more weight and credit than an unsworn statement." (quoting *Pickler v. State*, 220 Ga. 224, 225–26 (2) (138 SE2d 171) (1964)). Additionally, Coleman's proffer contained a proviso limiting its use to his state criminal proceedings, but any testimony he offered at Newton's trial regarding his proffer would have no such restrictions and could be used by government officials in subsequent federal criminal proceedings.

While any admissions Coleman might have made in response to the prosecutor's questions about his proffer would not have directly concerned compensation under the federal murder-for-hire statute, they could fairly be characterized as "links in a chain of facts imperiling [Coleman] with conviction of a federal crime." *Hoffman*,

341 U.S. at 488. As one example, the prosecutor asked Coleman, "[D]id you proffer that in order to prevent that witness from testifying and to attempt to help your friend evade prosecution, you set about learning the witness's location?" A truthful answer to this question would have required Coleman to testify about the *reason* he killed Powell — a reason that was not supplied by the accusation to which he pleaded guilty. Coleman's testimony that he killed Powell to help Newton evade prosecution would be material in a federal prosecution under the murder-for-hire statute, as it supplies a link in the chain of evidence needed to prove that Coleman murdered Powell at Newton's direction in exchange for promises of compensation. Because Coleman's testimony could have been used in this way, it is not "*perfectly clear*" that compelling Coleman to answer these questions could not "possibly" have had a tendency to incriminate him of a federal crime. Id. (emphasis in the original). It was therefore error for the trial court to compel Coleman to answer

the prosecutor's questions regarding the proffer,[11] and Coleman's contempt convictions corresponding to these questions must be reversed. [12]

---

[11] The State argues that Appellants' invocation of their Fifth Amendment rights at Newton's trial was invalid because they had waived those rights during their guilty plea hearings. Though Appellants did waive certain Fifth Amendment rights during their plea hearings, the scope of those waivers appears only to have covered their testimony during the guilty plea hearings themselves, and there were no express statements by Appellants, the State, or the court indicating that the waivers Appellants made during those hearings applied prospectively to other criminal proceedings, such as Newton's, which occurred nearly a year and a half later. And the State cites no further evidence or authority to the contrary. Accordingly, the State's claim of waiver fails.

[12] Based on the order and record before us, we cannot determine how Coleman's convictions correspond to the State's questions about his proffer because the order does not specify which conviction pertains to which question. Moreover, we cannot even determine how many contempt convictions Coleman received for his refusals to answer questions about his proffer. Recall that the State asked Coleman 24 questions, but the trial court only convicted Coleman of 19 counts of contempt because it determined that some of the State's questions were duplicative without specifying to which questions it was referring. So though the State asked Coleman 10 questions about his proffer, see note 8, supra, we cannot determine how many of Coleman's convictions to reverse.

As explained in Division 3, below, we vacate each of Coleman's convictions and sentences not reversed here in Division 2 and direct the trial court on remand to convict and sentence Coleman to only one count of contempt. Because Coleman will be convicted and sentenced to only one count of contempt, we need not determine precisely which counts are reversed. However, on remand, the trial court should consider these reversals when determining the sentence to impose for Coleman's contempt. See OCGA § 15-11-31 (a) ("In addition to all other inherent powers of the court to enforce its lawful orders, the court may punish an adult for contempt of court by imprisonment for not more than 20 days or a fine not to exceed $1,000.00 for willfully disobeying an order of the court or for obstructing or interfering with the proceedings of the court or the enforcement of its orders.").

3. As explained above, the trial court convicted Coleman of 19 counts of contempt and Walker of 21 counts of contempt for their refusals to answer questions during Newton's trial. Appellants argue that they should have been convicted and sentenced for only one count of contempt each. We agree.

Generally, "a defendant may not be convicted of two or more counts of the same crime where the evidence shows that the two counts are part of a single incident." *Taylor v. State*, 307 Ga. 755, 756 (1) (838 SE2d 261) (2020). Here, the trial court reviewed the State's proposed questions and ruled categorically that Appellants would be required to answer each of those questions, notwithstanding the assertion of their Fifth Amendment rights. Then, each time one of the Appellants refused to answer, the trial court effectuated its prior, categorical ruling with a specific direction to answer the question posed. In assessing Appellants' contempt, the trial court considered each refusal to comply with one of these directions as a separate instance in contempt.

By doing so, the court erred. Each of Appellants' several

28

refusals was part of a single, deliberate choice to stand on their rights against self-incrimination, and Appellants' refusals occurred in a quick and orderly succession during a single period of examination concerning a single topic: their roles in Powell's death. Just as the trial court ruled categorically that Appellants were required to answer each of the State's questions, so too did Appellants decide categorically to remain silent.[13]

Because Appellants' separate, improper refusals to answer questions occurred as part of a single incident during a single proceeding, separate penalties cannot be imposed for each count of contempt. See *Taylor*, 307 Ga. at 755-756 (1) (holding that the trial court erred by imposing 13 counts of contempt for a defendant who uttered thirteen obscene words during a single brief outburst). See also *Baker v. Eisenstadt,* 456 F2d 382, 390 (10) (1st Cir. 1972) ("Separate refusals to answer questions in the same proceeding,

---

[13] See *Mitchell v. United States*, 526 U.S. 314, 321 (II) (A) (119 SCt 1307, 143 LE2d 424) (1999) ("It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.").

prior to punishment, particularly when the refusals are based on the privilege against self-incrimination, cannot be the subjects of multiple contempt penalties."). Accordingly, "we vacate [Appellants'] convictions and sentences" not otherwise addressed in Division 2, above, "and remand the case[s] for the trial court to convict and resentence [Appellants] for only one instance of contempt" each. *Taylor*, 307 Ga. at 756 (1). On remand, we further direct the trial court to enter judgments of conviction and sentence only in the cases corresponding to the accusations under which Appellants pleaded guilty and not in the cases corresponding to their indictments, as those cases were nol prossed prior to Newton's trial.

4. Because we are vacating Walker's multiple convictions and sentences and directing the trial court to convict and sentence him for only one count of contempt, we need not address his contention that receiving multiple penalties for criminal contempt in this case violated the Eighth Amendment's prohibition on cruel and unusual punishment.

*Judgment reversed in part and vacated in part and case*

30

*remanded with direction. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, LaGrua, and Pinson, JJ, concur.*